UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MILES THOMAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:23-cv-1212-JMS-TAB |
| | ) |
| ALYSSA SECREST, | ) |
| SERGEANT DEAN HOLIAN, | ) |
| | ) |
| Defendants. | ) |

**Amended Complaint for Damages**

**Introduction**

1.  Plaintiff Miles Thomas is paraplegic, having experienced a spinal cord injury at the T2 thoracic vertebra. He has no sensory or motor function below his chest, but can use his arms and hands. As a result of his paraplegia, he is dependent on a wheelchair for mobility. He is a prisoner committed to the Indiana Department of Correction and was formerly housed at the Plainfield Correctional Facility. In April 2022, one of the wheelchair's wheels fell off. Despite Mr. Thomas's persistent requests, the wheelchair was never repaired, and it was not replaced for 20 days, when his father was finally permitted to bring a wheelchair to the facility. During those 20 days, he was repeatedly thrown out of the wheelchair onto the ground as it tipped forward onto the area of the missing wheel. Those falls were painful and humiliating, and one of them caused a

[1]

serious injury to his shoulder, from which he still suffers today. Defendants are responsible for the failure to repair the wheelchair and are responsible for his injuries. The defendants' actions and inactions violated the Eighth Amendment to the United States Constitution.

**Jurisdiction, venue, cause of action**

2. This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1331.

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391.

4. Declaratory relief is authorized by 28 U.S.C. §§ 2201, 2202 and by Rule 57 of the Federal Rules of Civil Procedure.

5. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the Constitution of the United States.

**Parties**

6. Miles Thomas is an adult who is currently incarcerated at Putnamville Correctional Facility.

7. At all times relevant to this complaint, Alyssa Secrest was the head nurse at Plainfield Correctional Facility.

8. At all times relevant to this complaint, Sergeant Dean Holian was a correctional officer employed by the Indiana Department of Correction.

**Factual allegations**

9. Mr. Thomas is presently incarcerated, and at the time of the incident described in this amended complaint, he was incarcerated at Plainfield Correctional Facility.

10. Mr. Thomas is paraplegic, having suffered a spinal cord injury at the T2 thoracic vertebra.

11. As a result of this injury, he has no sensation or motor function from the top of his chest through his toes. He is able to move his arms and hands.

12. He is 100% reliant on a manual wheelchair for mobility.

13. Because of the location of his injury, and the profound paralysis that resulted, it is nearly impossible for Mr. Thomas to maintain balance in his upper body.

14. He therefore requires a custom wheelchair, designed specifically to accommodate his paralysis and stabilize his trunk, allows him to transfer safely in and out of the chair, and allows him to manually operate it in a manner that does not jeopardize his safety.

15. Mr. Thomas has been using the same wheelchair since 2016, which he purchased prior to his incarceration. The Department of Correction has always allowed him to possess this custom wheelchair since he entered DOC custody.

16. In early April 2022, the front left caster wheel of his wheelchair came off while he was at work in the prison's kitchen. This occurred in the very early hours of the morning.

17.   As soon as it was realized that the wheel had come off, Mr. Thomas's kitchen supervisor instructed him to return to his dorm.  She did not think it was safe for him to be in the kitchen in his broken wheelchair.

18.   He attempted to wheel himself back to his housing unit, so that he could alert staff to the problem and have it resolved.

19.   On his way there, however, the wheelchair tipped forward onto the now empty front left fork, where the caster should have been, causing the chair to abruptly come to a stop.

20.   This threw Mr. Thomas out of the wheelchair and onto the sidewalk, landing on his side.

21.   When he landed on the sidewalk, it was extremely painful.

22.   At that time, he did not see anyone else out on the walk, and he does not believe that anyone saw him fall out of the chair.

23.   He tried to climb back into the chair himself, but the chair kept tipping forward because of the missing wheel.

24.   After a time, another inmate exited one of the dorm buildings and saw Mr. Thomas struggling to get back into his chair.  That individual assisted him into the wheelchair.

25.   When he arrived in his housing unit, he immediately notified the custody staff of the problem with his wheelchair, his fall, and the danger posed by the broken chair.

26. Those staff members informed him to notify the next shift's correctional staff, as the shift change was soon occurring.

27. He did so, and he asked those staff to allow him to go to medical so that medical staff could either fix his wheelchair or provide him with one that had functional wheels.

28. Those staff members permitted him to do so during lunch, so he wheeled himself to medical at that time.

29. When he arrived at medical, he spoke to Centurion's head of nursing at the facility, Alyssa Secrest.

30. He showed her the missing caster wheel and explained to her that the wheelchair was no longer safe for him to use, as he had already experienced one serious fall.

31. He also explained to her that future falls would be inevitable, as the lack of balance both in his body and from the broken chair would result in the same type of accident occurring again.

32. She indicated that she did not have an unoccupied facility wheelchair and that she was waiting on a shipment of additional chairs. Ms. Secrest informed Mr. Thomas that there was nothing she could do.

33. As the head of nursing, Ms. Secrest had the ability to request or procure a wheelchair for Mr. Thomas.

34. She also refused to attempt to repair his wheelchair or to seek anyone else who might have repaired it.

[5]

35. Mr. Thomas asked nurse Secrest if he could have a wheelchair delivered to the facility by a member of his family, as he had a replacement at his father's house. She immediately refused that request.

36. She instructed him to leave medical, which he did.

37. After that time, Mr. Thomas experienced a fall almost every time he left the dorm.

38. On April 5, 2022, Mr. Thomas spoke to two correctional lieutenants while in the dining hall, explaining the dangers posed by the missing wheel and the multiple falls he had experienced since the wheel had fallen off.

39. One of those lieutenants instructed the other to notify correctional sergeant Holian, who supervised Mr. Thomas's housing unit, of the issue.

40. They also instructed Mr. Thomas to give the missing wheel to Sgt. Holian, so that it could be used in any attempted repair. Mr. Thomas did so.

41. However, Sgt. Holian failed to take any action and no repairs were made to his wheelchair and no replacement was provided to him.

42. On April 7, 2022 and April 10, 2022, Mr. Thomas submitted Health Care Request forms indicating that his wheelchair was broken, was unsafe, and that he had repeatedly been thrown out of the chair.

43. Mr. Thomas was not taken to medical to address the issues raised in his Health Care Request forms, and his wheelchair was neither repaired nor replaced.

44. On April 13, 2022 following lunch, Mr. Thomas was leaving the north side dining hall in the broken wheelchair. The exit required him to descend a ramp from the door of the building to the sidewalk.

45. As he reached the sidewalk, his wheelchair again tipped forward onto the empty wheel fork, causing it to abruptly stop and throwing him from the chair to the sidewalk.

46. This fall was significantly worse than previous falls, as he was moving with greater speed coming down the ramp.

47. He landed on his right shoulder, immediately causing sharp pain to his shoulder and upper back.

48. He was also unable to use his right arm and could not sit up.

49. He laid on the sidewalk in excruciating pain until three correctional officers were together able to lift Mr. Thomas and put him back into the wheelchair.

50. They transported him immediately to medical, where he was evaluated by a member of the nursing staff. At that time, he was already experiencing redness and swelling to his shoulder, which were documented.

51. At that point, nurse Secrest brought Mr. Thomas a facility wheelchair to use.

52. That wheelchair, however, had arms that were welded in place and could not be lowered.

53. Because of the scope of his paraplegia, and because he must support his entire body weight using only his arms, Mr. Thomas can only transfer himself out of a

wheelchair when its arms are in a lowered position. When the arms are lowered, he can shift himself laterally to a chair or other structure that is parallel to him.

54. He informed nurse Secrest of this issue with the new wheelchair, and she instructed him to attempt anyway to transfer into the new chair.

55. He attempted to transfer, but was unable to do so and fell, further injuring his already injured shoulder.

56. Mr. Thomas then again asked, if the facility could not provide him with a safe and usable wheelchair, for his father to be permitted to bring to the facility an appropriate wheelchair for his use.

57. Ms. Secrest instructed Mr. Thomas to get back into the wheelchair with the broken wheel and to return to his dorm. He did so.

58. Late that afternoon, Ms. Secrest emailed another staff member about the possibility of Mr. Thomas's father bringing in the appropriate chair. In response to that staff member's question regarding whether Mr. Thomas could get around in the broken chair, Ms. Secrest stated:

> On Apr 13, 2022, at 4:39 PM, Secrest, Alyssa D <ASecrest@idoc.in.gov> wrote:
>
> He is getting around okay, it's just a safety risk. I'll include Hartzell on my call tomorrow so he can ask the important questions 😊
> Thank you,
> Alyssa Secrest, RN

59. Mr. Thomas was not, in fact, "getting around okay." He had just been in the medical office due to an injury that he suffered from a serious fall.

60. Ultimately, the facility approved Mr. Thomas's father to provide an appropriate wheelchair, and that chair was brought to the facility on or about April 20, 2022.

61. In the nearly twenty days that Mr. Thomas was forced to use the broken wheelchair, his mother called the facility on at least ten occasions and spoke to medical staff about her son's need for a safe and operable wheelchair.

62. Meanwhile, Mr. Thomas continued to experience extreme pain from his injured shoulder.

63. Although he submitted many Health Care Request forms regarding the pain he was experiencing from the injury, he did not receive any diagnostic testing until an X-ray was taken on April 27, 2022—two full weeks after the injury.

64. That X-ray indicated a possible fracture, and another examination was recommended by the outside physician.

65. Another examination did not occur, and Mr. Thomas continued to complain of his significant pain and request further treatment.

66. Another X-ray was eventually ordered on May 16, 2022.

67. An email from Ms. Secrest, sent in response to a grievance filed by Mr. Thomas, indicated that a second X-ray "showed no significant changes" from the first X-ray.

68. Based on Ms. Secrest's response to the grievance officer, Mr. Thomas's grievance regarding his shoulder pain was denied, and no further diagnostic measures or treatment were offered to him.

69. The only treatment he ever received for his shoulder injury was Tylenol, which he repeatedly indicated was not sufficient to manage his pain.

70. Mr. Thomas continued to experience pain in his shoulder while stationary for months.

71. Mr. Thomas still experiences pain in his shoulder with certain movements or in certain positions. He still cannot lay on that side of his body, because it causes him significant pain.

72. At all relevant times, the defendants were acting under color of state law.

73. The plaintiff fully exhausted his administrative remedies.

**Legal claims**

74. The actions of the defendants violated the Eighth Amendment to the United States Constitution.

**Jury Demand**

75. Mr. Thomas requests a jury trial on all claims so triable.

**Request for relief**

WHEREFORE, plaintiff requests that this Court:

    a. accept jurisdiction of this case and set it for hearing at the earliest opportunity;

    b.    declare that the actions of the defendants violated the Eighth Amendment of the United States Constitution for the reasons noted above;

    c.    award plaintiff his damages, following a jury trial, along with his costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

    d.    award all other proper relief.

> Stevie J. Pactor
> ACLU of Indiana
> 1031 E. Washington St.
> Indianapolis, IN 46202
> 317/635-4059
> fax: 317/635-4105
> spactor@aclu-in.org
>
> Attorney for Plaintiff